UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:17-cv-20631

AFFILIATED FM INSURANCE
COMPANY a/s/o Camerican
International, Inc., and CAMERICAN
INTERNATIONAL, INC.,

    Plaintiffs,

vs.

DEPENDABLE WAREHOUSING &
DISTRIBUTION, INC.,

    Defendant.
_____/

## AMENDED COMPLAINT

Plaintiffs, AFFILIATED FM INSURANCE COMPANY a/s/o Camerican International, Inc. ("AFM") and CAMERICAN INTERNATIONAL, INC. ("CAMERICAN") (collectively the "PLAINTIFFS"), by and through their undersigned counsel, hereby sue Defendant, DEPENDABLE WAREHOUSING & DISTRIBUTION, INC. ("DEPENDABLE"), and state the following upon information and belief:

## INTRODUCTION

1.    This is an action for breach of a bailment contract arising from damage to frozen vegetables ("Vegetables"), owned by CAMERICAN, insured by AFM, and tendered for cold storage to DEPENDABLE.

2.    This is also an action for violation of the Florida Deceptive and Unfair Trade Practices Act against DEPENDABLE, who acknowledged liability to CAMERICAN for its

damages, misrepresented to CAMERICAN that DEPENDABLE'S insurance would cover the claim, and instead retained the proceeds owed to CAMERICAN for themselves.

## PARTIES

3. CAMERICAN was and is a Delaware corporation with its principal place of business at 75 Eisenhower Drive, Paramus, New Jersey, 07652.

4. CAMERICAN is an importer of foodstuffs. CAMERICAN owned the Vegetables.

5. AFM was and is a Rhode Island corporation with its principal place of business at 270 Central Avenue, Johnston, Rhode Island, 02919.

6. AFM insured the Vegetables, paid CAMERICAN'S losses resulting from the incident detailed herein, and is thereby subrogated to CAMERICAN'S rights to the extent of that payment.

7. AFM and CAMERICAN bring this action on their own behalf and as agents or trustees on behalf of all having an interest in the subject action.

8. DEPENDABLE was and is a Delaware company with its principal place of business at 2900 NW 75th Street, Miami, Florida, 33147.

9. DEPENDABLE operates a cold storage facility located at 2900 NW 75th Street, Miami, Florida ("Dependable's Cold Storage Facility"), and contracted with CAMERICAN to cold store the Vegetables.

## JURISDICTION & VENUE

10. This is an action between parties of diverse citizenship, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

11. This Honorable Court has personal jurisdiction over DEPENDABLE, and venue is proper pursuant to 28 U.S.C. § 1391, because DEPENDABLE resides in Miami-Dade County.

## BACKGROUND

12. In or before February 2013, CAMERICAN hired DEPENDABLE to cold store its Vegetables pending their sale to CAMERICAN's customers.

13. Documents evidencing a bailment agreement for the cold storage are attached hereto as **Exhibit "1"** ("Agreement").

14. From February 2013 to February 2014, CAMERICAN imported 10,371 cases of Vegetables and delivered them to DEPENDABLE for storage at Dependable's Cold Storage Facility.

15. In or around August 2014, the refrigeration unit(s) malfunctioned in one or more of DEPENDABLE's cold-store units wherein 6,975 cases of CAMERICAN's Vegetables were stored.

16. DEPENDABLE failed to recognize the malfunction and either repair the refrigeration unit(s) or transfer the Vegetables to storage units with functioning refrigeration.

17. As a result, the 6,975 cases of Vegetables thawed and spoiled, rendering them a total loss.

18. On or around August 27, 2014, one of CAMERICAN's customers, Antonio Pena Distributors ("Pena"), informed CAMERICAN via email that 339 cases of Vegetables it received from Dependable's Cold Store Facility had sustained temperature abuse.

19. On September 4, 2014, CAMERICAN's Jim Petrolino ("Mr. Petrolino") notified DEPENDABLE of the damaged Vegetables received by Pena.

CASE NO.: 1:17-cv-20631
*Amended Complaint*

20. On September 11, 2014, Mr. Petrolino visited Dependable's Cold Storage Facility to inspect the Vegetables remaining there and discovered that CAMERICAN's entire inventory had sustained temperature abuse.

21. In a September 16, 2014 email, CAMERICAN's Hee So ("Ms. So") informed DEPENDABLE that CAMERICAN's entire inventory stored at Dependable's Cold Storage Facility had sustained damage and stated "[a]t this time, please accept this email as our formal notice and intent to claim for all damages."

22. On September 22, 2014, DEPENDABLE's Owner and President, Manuel Rivas ("Mr. Rivas"), acknowledged receipt of Ms. So's September 16, 2014 email.

23. A true and correct copy of the email thread referenced in ¶¶ 19-22 is attached hereto as **Exhibit 2**.

24. On November 13, 2014, Ms. So emailed a claim statement that itemized CAMERICAN'S loss to Mr. Rivas.

25. A true and correct copy of the November 13, 2014 email referenced in ¶ 24 is attached hereto as **Exhibit 3**.

26. On November 20, 2014, Mr. Rivas met with CAMERICAN representatives and advised them that DEPENDABLE would be filing a claim with its insurer, The Hartford ("Hartford"), to cover CAMERICAN's loss.

27. From November 21, 2014, to January 22, 2015, Ms. So inquired via email several times into the status of DEPENDABLE's claim with Hartford.

28. In response, Mr. Rivas advised that he had met with his insurance agent regarding the claim and that an adjuster had visited Dependable's Cold Store Facility to inspect the Vegetables.

29. On January 23, 2015, Mr. Rivas sent an email to Ms. So advising as follows:

> The claim is well on its way, Claim#: [sic] Hartford 000421212 / 41220993.  The adjuster on our end has inspected the goods twice, and every answer they have requested submitted.  Since the policy is for [Dependable] I don't think having another party involved would be convenient, information can be misconstrued or differ from what has already been submitted and that could either delay or jeopardize coverage.  Insurance claims take long to settle as we all know, please be patient as I'm working hard that this coverage gets taken care of.

30. A true and correct copy of the email thread referenced in ¶¶ 27-29 is attached hereto as **Exhibit 4**.

31. On February 9, 2015, Mr. Rivas (1) advised Ms. So by email that an unidentified individual had contacted Hartford with the claim number he had provided claiming an interest in the Vegetables and (2) asked whether CAMERICAN, CAMERICAN's insurer, or CAMERICAN's insurance broker had contacted DEPENDABLE's insurer.

32. Ms. So responded that same day to advise that neither CAMERICAN, CAMERICAN's insurer, nor CAMERICAN's insurance broker had contacted DEPENDABLE's insurer.

33. A true and correct copy of the February 9, 2015 email exchange referenced in ¶¶ 31-32 is attached hereto as **Exhibit 5**.

34. In a February 18, 2015 email, Mr. Rivas again asked Ms. So whether anyone representing CAMERICAN had contacted Hartford.  In that email, Mr. Rivas also requested an invoice for the Vegetables being claimed, explaining that this would assist in finalizing payment from Hartford.

35. Ms. So responded that same day to again confirm that no one representing CAMERICAN had contacted Hartford, and on February 24, 2015, Ms. So provided Mr. Rivas with the requested invoice and supporting documents.

36. A true and correct copy of the email exchange referenced in ¶¶ 34-35 is attached hereto as **Exhibit 6**.

37. On February 25, 2015, Mr. Rivas stated to Ms. So during a telephone conversation that Hartford was prepared to pay CAMERICAN's claim but that a hold had been placed on the payment because a third party claimed an interest in the Vegetables.

38. On April 20, 2015, CAMERICAN's Chief Financial Officer & Treasurer, Jay Breslow, sent an email to Mr. Rivas requesting an update on the claim.

39. Mr. Rivas responded that same day, advising "I have been going back and forth with the adjuster in hopes of getting closure as soon as possible. I will keep the pressure on them as much as possible . . . [and] will try and get some sort of solid answer from them . . . ."

40. A true and correct copy of the April 20, 2015 email exchange referenced in ¶¶ 38-39 is attached hereto as **Exhibit 7**.

41. However, DEPENDABLE *was never insured by Hartford* and it, accordingly, never filed a claim with Hartford for the damage caused to the Vegetables, as DEPENDABLE (via Mr. Rivas) claimed.

42. DEPENDABLE never paid CAMERICAN for the damage caused to the Vegetables.

43. As a result, CAMERICAN suffered monetary losses totaling $97,721.84.

44. CAMERICAN filed a claim for that amount with its insurer, AFM, and AFM paid CAMERICAN $92,721.84 ($97,721.84 less CAMERICAN's $5,000.00 deductible) in settlement

of the claim. AFM thereby became subrogated to CAMERICAN's rights to the extent of that $92,721.84 payment.

45. CAMERICAN retains $5,000.00 in uninsured losses, the amount of its deductible.

## COUNT I
## BREACH OF BAILMENT AS AGAINST DEPENDABLE

46. Paragraphs 1 through 45 are incorporated by reference as though fully set forth at length herein.

47. The parties entered into a valid and enforceable bailment agreement as evidenced by the documents attached hereto as **Exhibit "1"** ("Agreement").

48. CAMERICAN performed all its duties and obligations thereunder by paying DEPENDABLE the agreed fee for cold storage of the Vegetables.

49. Under the Agreement, DEPENDABLE was obligated "to exercise such care in regard to the [the Vegetables] as a reasonable careful man would exercise under like circumstances." Agreement, Clause 11(A).

50. DEPENDABLE breached that obligation by failing to recognize the refrigeration breakdown and take necessary steps to prevent temperature-related damage to the Vegetables.

51. As a direct and proximate cause of DEPENDABLE's breach, Plaintiffs sustained damages, as nearly can now be determined, no part of which has been paid although duly demanded, in the sum of $97,721.84.

## COUNT II
## DECEPTIVE AND UNFAIR TRADE PRACTICES AS AGAINST DEPENDABLE

52. Paragraphs 1 through 51 are incorporated by reference as though fully set forth at length herein.

53. The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204.

54. DEPENDABLE assured CAMERICAN that it had filed a claim with its insurer, Hartford; that Hartford adjusters had inspected the damaged Vegetables; and that Hartford would issue payment for their losses specified herein.

55. However, Hartford *never insured* DEPENDABLE, and DEPENDABLE's assurances to CAMERICAN were outright lies. In fact, DEPENDABLE never intended to pay CAMERICAN for its losses occasioned by DEPENDABLE's breach of bailment contract.

56. Rather, DEPENDABLE (1) was insured through another insurer, collected insurance proceeds intended to resolve CAMERICAN's claim, but decided to keep those proceeds for itself; (2) was insured through another insurer yet never filed a claim with that insurer, explicitly recognized that it was liable for CAMERICAN's claim, but decided to keep the proceeds it owed CAMERICAN for its losses occasioned by DEPENDABLE's breach of bailment contract; or (3) DEPENDABLE was never insured, explicitly recognized that it was liable for CAMERICAN's claim, but decided to keep the proceeds it owed CAMERICAN for its losses occasioned by DEPENDABLE's breach of bailment contract.

57. Under any of these scenarios, DEPENDABLE's actions constitute "unconscionable acts or practices, and unfair or deceptive acts or practices" in violation of FDUTPA, Fla. Stat. § 501.204.

CASE NO.: 1:17-cv-20631
*Amended Complaint*

58. As a direct and proximate cause of DEPENDABLE's FDUTPA violation, Plaintiffs sustained damages, as nearly can now be determined, no part of which has been paid although duly demanded, in the sum of $97,721.84.

WHEREFORE, Plaintiffs AFFILIATED FM INSURANCE COMPANY a/s/o Camerican International, Inc. and CAMERICAN INTERNATIONAL, INC. demand judgment in their favor and against the Defendant, DEPENDABLE WAREHOUSING & DISTRIBUTION, INC. in the principal amount of $97,721.84, together with all allowable interest thereon, reasonable attorneys' fees, costs and disbursements, and such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

PLAINTIFFS hereby demand a jury trial on all claims, defenses, and issues raised in the entire case, and that are so triable as a matter of law.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 9, 2017, by electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List.

Respectfully submitted,
JANSSEN, SIRACUSA & KEEGAN PLLC
120 S. Olive Avenue, Suite 504
West Palm Beach, FL 33401
Tel.: (561) 420-0583
Fax: (561) 420-0576
Email: jjanssen@jasilaw.com
Email: jsiracusa@jasilaw.com

By: *s/ Joseph W. Janssen, III*
JOSEPH W. JANSSEN, III
Florida Bar No. 160067
JOHN M. SIRACUSA
Florida Bar No. 159670

CASE NO.: 1:17-cv-20631
*Amended Complaint*

**SERVICE LIST**:

**Nathan T. Williams, Esq.**
Kennedy Lillis Schmidt & English
75 Maiden Lane, Suite 402
New York, NY 10038
Tel.: (212) 430-0800
Fax: (212) 430-0810
Email: nwilliams@klselaw.com

**Puemsuk Tony Pornprinya, Esq.**
Law Office of Tony Pornprinya
1555 NE 123rd Street
North Miami, FL 33161
Tel.:(305) 893-8989
Fax: (305) 891-7717
Email: tony@miamidadelaw.net